FILED - USDC -NH
2021 NOV 22 PM 12:45

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Lidia Taranov | ) |
| Pro se   Plaintiff | ) |
|      Through Next Friend, | ) |
|      Tatiana Taranov and | ) |
|      Next Friend Leonid Taranov | ) |
| | ) |
|           vs. | ) |
| | )   CIVIL ACTION NO. |
| Area Agency of Greater Nashua, a.k.a. | ) |
| Region VI Area Agency/ d.b.a. | ) |
| Gateways Community Services, Inc.; | ) |
| Sandra Pelletier, Gateways President &CEO; | ) |
| Mindy Huckins, Gateways Senior Director | ) |
| of Family & Participant Directed Services | ) |
| | ) |
| | ) |
| | ) |
| Defendants | ) |

Verified Complaint
with Jury Demand
For a Declaratory Judgment,
Preliminary Injunction,
Temporary Restraining Order, and
Damages

## I. PRELIMINARY STATEMENT

1.   Now comes the Plaintiff and alleges as follows:   This
Complaint challenges actions of Gateways Community Services
("Gateways"), its President and CEO, Sandra Pelletier, and the
Gateways' Senior Director of Family and Participant-Directed
Services, Mindy Huckins, in willfully and maliciously depriving

Plaintiff of access to her federally-funded benefits/ medical assistance by terminating her adult foster care services and coverage thereof.  For over 15 years, since March of 2006 and until the Defendants stopped covering them on July 13, 2021, Plaintiff was receiving adult foster care services, comprised of covered and needed complex and individually tailored array of skilled-nursing level of care under the jointly federally- and state-funded program called Acquired Brain Disorder Medicaid Waiver ("ABD Waiver").  Plaintiff is a fully qualified and eligible severely disabled current participant in the New Hampshire ABD Medicaid Waiver since 2005. She requires skilled-nursing level of care and chooses to receive it in the most integrated setting — her family home.

2.   For over 15 years, since March of 2006 until July 13, 2021, the Plaintiff received adult foster care services through an adult foster care provider ("FCP"), contracted with Gateways and aided 24/7 by hourly unlicensed low-skill staff.  The Defendant's Sandra Pelletier's willful and malicious actions under color of law in terminating Plaintiff's access to her long-standing and well-established care and federally-funded benefits violate Plaintiff's statutory rights to prompt medical assistance under the Medicaid Act, violate her rights to due process of law, violate her rights to equal access to benefits

in a program wherein she is a fully qualified participant;
deprive her of her federally-funded benefits under color of
law, and put her life in grave danger.

3.    The Defendant, Gateways, has itself developed Plaintiff's
Individual Service Agreement (hereinafter, the "ISA", a.k.a
"plan of care") describing in detail the Plaintiff's condition
and service needs.

4.    Plaintiff, according to this ISA, among other things, is
at risk of exploitation and abuse by strangers.  According to
her ISA, she requires complex 24/7 skilled-nursing level of
care in order to live safely in her family home — the most
integrated setting for her.

5.    The state laws implementing the ABD Medicaid Waiver
federal funds and Medicaid laws and regulations mandate
adequate staffing at community and family residences serving at
least one individual.  These regulations, among other care
standards, also mandate specific staff supervision, training,
and development; require 24/7 support for emergency management;
residence oversight and administration, household management,
money management, and non-medical transportation. These
regulations require that all services be tailored to the
individual needs, abilities and life-style preferences of the
individual being served.  Quality care, measures to ensure the

patient's safety, and free choice of providers for each aspect of care are key benefits under the ABD Waiver.

6.  For over 15 years, *since 2006 and until the Defendants lawlessly terminated coverage for this care starting July 14th, 2021, the Plaintiff was receiving all of these and additional necessary, complex, and individually tailored services through her adult foster care provider. The Defendant's Sandra Pelletier's denial of service and coverage letter is dated August 31, 2021, however no payments have been made to providers for Plaintiff's adult foster care services since July 14th.*

7.  Defendant's Pelletier aforementioned denial letter of August 31 did not state clearly that adult foster care was being denied.  However, subsequent e-mails from the Defendant Mindy Huckins do so explain, and the absence of any payments for the adult foster care services after July 14th confirm the deprivation of access to care and federally funded individualized budget for the Plaintiff's care.

8.  Thus, since July 14th, no payment for adult foster care services has been received.  No medical assistance payments (defined in the Medicaid Act as "payment to providers for services") have been made from the Plaintiff's substantial individual allocated budget except for her 24/7 hourly personal

care staff and their "general management" at 9% of staff

payroll (a purely fiscal and administrative service comprised

of adhering to employment and tax laws, running staff pay-roll,

carrying worker's compensation insurance, and addressing um-

employment insurance claims).

9.     Thus, since July 14th, the Defendants have not provided

any coverage/ medical assistance for *anything* other than the

24/7 hourly personal care staff and its general management,

leaving the Plaintiff for 168 hours each week one-on-one in the

care of these frequently changing, low-skill, unsupervised,

unlicensed, and inexperienced hourly care-givers. The Plaintiff

has only survived thanks to borrowing funds in order to pay for

the care provided by the person living with her, Vera

Zavivalkina, who the Plaintiff's family chose well before July

13, to serve as Plaintiff's next adult FCP, months before the

resignation of the prior long-standing FCP.

10.     Plaintiff has been forced to borrow funds to pay for her

care in order to avoid injury and death in the absence of

coverage for her Services.  Had she not borrowed to pay for her

care, she could have been injured or died many times over when

left short-staffed (and, therefore, alone) or one-on-one in the

care of new, inexperienced, low-skill, un-licensed, tardy, and

un-supervised hourly staff devoid of any support and absent the

required 24/7 emergency management, staff supervision, development and training, staff scheduling and re-scheduling, medical and hygienic supplies, meal plan and groceries, medications, non-medical transportation, care management, money management, and residence oversight.

11. The Plaintiff is now in debt, and yet her family's ability to continue lending the funds her care is running out. Plaintiff is now facing imminent risk of institutionalization or injury and death if left without the care she needs. Defendants have made her go into debt to receive the care she needs and should be receiving as a fully qualified current participant in the ABD Medicaid Waiver Program.

12. The Defendant's hourly personal care staff have no qualifications to independently provide brain injury care and cannot provide brain injury care in the absence of supervision, supplies, residence oversight, staff development and training, on-call 24/7 emergency management, scheduling, re-scheduling, obtaining and managing supplies and equipment, medications, medical and other appointments, a meal plan, money management, transportation, and monitoring the hourly personnel for showing up to work, refraining from drug or alcohol use at the residence, abusing the Plaintiff, or stealing. All of the above services were provided for over 15 years by the adult

foster care provider until the Defendants unlawfully terminated Plaintiff's access to this care and cut off coverage in blatant disregard for the law and Plaintiff's life.

13. Federal law requires that the NH DHHS furnish prompt medical assistance in the form of payment to the providers of services for disability-related Medicaid benefits within ninety (90) days of the claimant's application for medical assistance. Once eligible and enrolled in the Waiver Program, the plaintiff is entitled to fully participate in the program and to access the covered services warranted by her medical/ health conditions. The Medicaid laws and implementing state regulations mandate quality care, measures to ensure the patient's safety, and continuity of care. The Defendants, acting under color of law, deprived the Plaintiff of her federally-funded rights and benefits. The Defendants terminated plaintiff's long-standing care and services and cut medical assistance for them, under color of law, in a willful and malicious way. The federal and state laws, the custom and practice of caring for the Plaintiff since 2006, the Plaintiff's ISA developed by the Defendant Gateways itself were clearly established, and no reasonable official could have believed that depriving the Plaintiff of her critical skilled nursing level of care, leaving her alone in the hands of

unsupervised and unsupported low-skilled staff at a residence without oversight was lawful.

## RELIEF SOUGHT

14.  Plaintiff brings this action seeking all appropriate relief and protection through a declaratory judgment to restore services and coverage beginning July 14th, seeking, also, an emergency temporary restraining order mandating adult foster care and coverage, seeking, also, a preliminary and a permanent injunction enjoining Defendants from depriving Plaintiff of her care and coverage;

15.  Plaintiff prays for attorneys' fees and/or punitive damages if warranted.

16.  Plaintiff seeks to preliminarily and permanently enjoin Defendants from refusing to comply with federal law, to enjoin Defendants from arbitrarily, willfully, and maliciously depriving Plaintiff of her federally-funded medical assistance and her due process rights.

17.  Plaintiff seeks to enjoin, also, the Defendants from depriving her of equal access to the Medicaid benefits in the program wherein she is a fully-qualified and eligible disabled participant, and from providing less effective services to her than may be provided to other participants in this program who are less or differently disabled.

18. Plaintiff seeks to enjoin the Defendants from depriving her of her long-standing home-based adult foster care, and from depriving her of her rights to receive care (and coverage therefor) in the most integrated setting.

19. Plaintiff seeks any and all relief appropriate from the willful and malicious actions of administrative officials clothed with state authority to administer joint Federal and state funds. The Defendants have a duty and the authority to ensure quality care for the Plaintiff in accordance with law. Plaintiff seeks this Honorable Court's protection from Defendants' malicious actions taken under color of law that offend and shock the conscience in their lawlessness and inhumanity. Defendant's actions are putting Plaintiff's life and safety at risk. No reasonable public official in Defendants' position could have believed that depriving the brain injured Plaintiff of her critical care, leaving her alone in the hands of low-skilled unsupervised and unsupported staff was lawful.

20. The Plaintiff seeks to pierce the corporate veil and any qualified immunity of the individual Defendants, and to reach the individual Defendants S. Pelletier and M. Huckins in their personal capacities for punitive damages and attorneys' fees in light of the willful and malicious nature of their conduct.

21.  When the nature of an official's conduct is wanton, malicious, and lawless, s/he  should expect in all fairness that the corporate veil can be pierced and that any potential qualified immunity may be un-available, and they could face personal liability for the willful and malicious actions that openly and wantonly violate the clearly established laws.  The lawless and malicious nature of the Defendants' actions against the defenseless Plaintiff shocks the conscience.  They should not be allowed to hide from personal liability behind the corporate veil and/ or qualified immunity.  Allowing them to hide behind corporate veil or qualified immunity for conduct that shocks the conscience would send a signal to other public officials that they, too, could be shielded from meaningful responsibility for willfully and knowingly abusing their authority in order to destroy the very citizens they were charged with a duty to serve and protect.

## II. JURISDICTION

22.  This Court has jurisdiction under 28 U.S.C. § 1331, which provides for original jurisdiction over all civil suits involving questions of federal law.

23.  This Court has jurisdiction under 28 U.S.C. § 1343 (3) and (4) which grants this Court original jurisdiction in all actions authorized by 42 U.S.C. § 1983 to redress deprivations

under color of state law of any rights, privileges, or immunities guaranteed by the United States Constitution or acts of Congress.

24. This action is authorized by 42 U.S.C Sec. 1983, 12133 and by 28 U.S.C. Sec. 2201 and 2202.

25. Venue is proper pursuant to 28 U.S.C. Sec. 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

26. Plaintiff seeks declaratory, injunctive, and all other appropriate relief, including, if warranted, punitive damages, treble damages, and attorneys' fees pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 1983 and 12133.

27. Plaintiff also seeks all appropriate relief as the intended third party beneficiary to the contracts between the federal and the state agencies and between the state agencies involved in administering the waiver program. This contract claim is joined with Plaintiff's causes of action to enforce her constitutional claims and the substantive Medicaid Act provision under § 1983. This inextricable connection gives rise to federal question jurisdiction. This court can hear the contract claim pursuant to the supplemental jurisdiction provisions of 28 U.S.C. § 1367.

## III. PARTIES

## A.    Individual Plaintiff

28.   Lidia Taranov ("Lidia") is 75 year old resident of Bedford, New Hampshire, with an address at 12 Cooper Lane, Apartment 103, Bedford NH, 03110, and she is participating in the Medicaid ABD Waiver since August of 2005. For over 15 years, since March of 2006, Lidia has received her complex and individually tailored care at home through an adult foster care provider contracted with Gateways.

## B.    Defendants

29.   **Sandra Pelletier** is the President and CEO of the Area Agency of Greater Nashua/ a.k.a. Region VI Area Agency, d/b/a "Gateways Community Services."

30.   **"Gateways Community Services"** ("Gateways"), located at **144 Canal Street in Nashua NH 03064** — is a New Hampshire not-for-profit corporation that administers the ABD waiver program and the federal funds in the pertinent geographical region in New Hampshire. under the auspices of the New Hampshire Department of Health and Human Services ("DHHS") and is responsible, *inter alia,* for the administration of the State's Medicaid Waiver program in the Greater Nashua Area.  Gateways is one of the agencies and bureaus subordinated to NH DHHS, and is a public

entity within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. Sections 12131-12134.

31.  **Mindy Huckins** is the Senior Director of Family and Participant-directed Services at Defendant Gateways, responsible, *inter alia,* for implementing the deprivation of Plaintiff's access to her care and benefits.

32.  In particular, Sandra Pelletier and Mindy Huckins are responsible for the supervision of the administration of the ABD Medicaid Waiver program by Gateways Community Services. The Defendants are sued in their personal and official capacities. The Defendants have been repeatedly informed of the Plaintiff's rights, and have willfully and maliciously deprived her of her federally-funded benefits, her care, and of her federal rights.  Their conduct constitutes a federal crime under Title 18, Section 242, and the Plaintiff will be filing a complaint with the US DOJ on the facts presented in this verified Complaint.

## IV. FACTS COMMON TO ALL CLAIMS FOR RELIEF

## Statutory and Regulatory Framework

33.  The Medicaid coverage/ medical assistance program ("Medicaid") pays for medical services to disabled individuals (among others) whose income and resources are insufficient to meet the costs of the necessary medical/ nursing/

rehabilitation care. See 42 U.S.C. § 1396. The federal and state government share costs. Federal Government pays for about 79% of the costs of Plaintiff's care, while the State's Waiver program pays for about 21% of the plaintiff's care costs (these percentages are according to the 2007 numbers from the NH General Court).

34.   42 U.S.C. §1396a(a)(8) requires that Medicaid must be "furnished with reasonable promptness to all eligible individuals."

35.   42 C.F.R. § 435.911 mandates the Department to "furnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures."

36.   Federal regulations at 42 CFR 440.230(b) entitle Plaintiff to receive medical assistance for services in such amount, scope, and duration as she needs for her condition.  The NH ABD Waiver contract in force between NH and the Federal Office Of Health Care Finance and Administration (the U.S. DHHS HCFA) provides for participant access to the covered services without any arbitrary or unjustified limits so long as a participant's medical/ health conditions warrant these services.

37.   The NH DHHS administers the Medicaid Plan and the Medicaid ABD Waiver in New Hampshire through the BDS and Area Agencies, such as the Area Agency of Greater Nashua.  Pursuant to 42

U.S.C. §1396a(a)(8) and its implementing regulation, 42 C.F.R. §435.911(a)(1) and (b), the DHHS Medicaid Disability Determination Unit ("DDU"), must mail notice of its decision to applicants, who apply for Medicaid on the basis of disability, within ninety days from the date of application.

38. There is no requirement for exhaustion of administrative remedies before seeking relief and protection at Federal Court;

39. The State of New Hampshire obtained from the Secretary of U.S. Health and Human Services a Medicaid waiver under Section 1115 of the Social Security Act, 42 U.S.C. Sec. 1315. This waiver is an enforceable contract between the federal Health Care Finance Authority (the "HCFA") and the NH DHHS. Plaintiff is one of the intended beneficiaries of this contract.

40. The ABD Medicaid Waiver allows the State additional flexibility in fulfilling its _Olmstead_ obligations by permitting the Defendant to operate the ABD program and exempting the program from (only) the community income and resource rules for the medically needy and the comparability rules. The state is also allowed to set stringent criteria for who may participate in the program and for how many participants the Program will serve. These flexibilities allow the program to offer services not otherwise available outside of the program, albeit the number of participants is very

limited throughout the state.  Limiting the number of participants at the State's own discretion allows the state to limit its financial exposure.  In designing its program, the state also has flexibility to select which services it will offer under the program.  All laws and rules not explicitly waived remain fully applicable to the ABD Waiver program. Among the terms and conditions of the waiver are an enumeration of the amount, duration and scope of services to be provided to ABD participants.  Under the terms of the ABD waiver, the amount, scope, and duration of the covered services and the access thereto depend on each participant's individualized needs. Payments for covered care and services must be consistent with quality of care, and equal access.[1] Freedom of provider choice" provision,[2] creates enforceable rights under section 1983 of the Civil Rights Act.[3] Arbitrary limits on waiver participants' access to needed benefits endanger their health and well-being. Budgetary constraints cannot justify arbitrary limits on access to needed care.[4] New Hampshire may not alter these rules without approval of the U.S. DHHS

---

[1] Section 1902(a)(30)(A) of the Social Security Act;

[2] 42 U.S.C. §1396a(a)(23) of the SSA,

[3] See, *Harris v. Olszewski*, 442 F.3d 456 (6th Cir. 2006);

[4] "Olmstead Letter #4" from the U.S. CMS

Secretary. No such approval that would be pertinent to this case has been sought or received. Notwithstanding these rules, the Defendants unlawfully deprived the Plaintiff of access to medical assistance for her adult foster care services under color of law and in a willful and malicious manner. Plaintiff's Durable Power of Attorney has provided a copy of this Complaint to the Defendants numerous times prior to filing the instant action, seeking to inform them of the Plaintiff rights, the ABD Waiver legal requirements and the legal protections for the Plaintiff's well-being, her access to care and benefits. In denying the benefits to Plaintiff for which she is fully qualified and eligible, the Defendants have lawlessly barred her from full participation in the program. Their unconscionable actions endanger the plaintiff's life, caused her to sustain grave injuries in the past, and continue to put her and her natural supports in harms' way.

### **Facts related to Plaintiff, Lidia Taranov.**

41. Plaintiff was in excellent health and worked full-time in real estate up until November 2004 when she suddenly fell ill with a deadly form of meningitis. She was 58 years old at the time and had been a long-time resident of Nashua, NH.

42. In December of 2004, her illness produced a severe brain injury resulting in multiple cerebral strokes and severe

disabilities, including complete tragic blindness, hemiparesis, incontinence, and severe cognitive, behavioral, emotional, and physical impairments. Ever since becoming so ill, the Plaintiff has required complex specialized nursing services on a 24/7 basis and, subsequently also complex and specialized rehabilitation services.

43. Initially, in or about December of 2004, Plaintiff was in a coma and was hospitalized at Massachusetts General Hospital in Boston, MA. While there, through her daughter, Plaintiff applied for APTD benefits in or about December of 2004.

44. Subsequently, in or about July of 2005, Plaintiff applied to participate in the NH ABD Waiver and was found eligible and given an ABD Waiver "slot" in about August of 2005.

45. Thereafter, on about August 31, 2005, Plaintiff became a resident at one NH ABD Waiver providers, then known as "Rosemeadow Farm," a specialized group home for ten or eleven persons with brain injury. However, this specialized brain-injury group home quickly became overwhelmed with Plaintiff's needs and gave her a notice to leave only about seventy five days into her stay with them. Plaintiff's condition while at the group home deteriorated due to the lack of the services she needed. During her short stay at the group home, the Plaintiff suffered numerous falls, bruises and abrasions, four broken

teeth, and persistent life-threatening infections rendering her delirious, combative and, ultimately, unconscious, requiring two hospitalizations and aggressive and prolonged antibiotic treatment. Her strength and mental status deteriorated while at the group home, she was restrained for hours at a time and medicated with psychotropic medications because the home was unable to manage her hallucinations, loud, aggressive, and disruptive behaviors caused by lack of activity, and lack of treatment for her urinary tract infections caused by poor hygiene and lack of assistance to prevent incontinence.

46. As a result of prolonged absence of appropriate medical attention for a urinary tract infection, while at the group home, the Plaintiff became hypothermic and unconscious and was hospitalized for the second time at the Elliot Hospital in early January of 2006. Upon her recovery, the group home refused to accept her back. Due to the lack of any other long-term care provider willing to admit her, Plaintiff had to remain at the Elliot Hospital long past her recuperation, until about March 20, 2006.

47. At that time, nearly three months into her stay at the hospital, the Plaintiff was finally taken to her adult foster care home. The adult foster care provider signed a contract with Gateways and became "adult foster care provider" for the

Plaintiff under the ABD Waiver.  No other facility or other "provider" was willing to serve Plaintiff.

48.  Plaintiff currently remains severely disabled and requires specialized nursing services 24/7, rehabilitation services, and supervision around the clock.  Plaintiff is unable to recruit, manage, supervise, or train her personal care staff; unable to manage her living environment, her care, her transportation or vehicle, her nutrition, her budget, her resources, her household bills, or any aspects of her life.  Plaintiff's  24/7 personal care requires considerable stamina and is labor-intensive.  Plaintiff is at risk of abuse and exploitation from strangers, at risk of falling, chocking on food, infections and unable to seek help or manage any aspects of her daily life on her own.  Plaintiff's adult foster care provider coordinated and managed Plaintiff's environment and all aspects of her complex care, staff recruitment, management, training, and development; Plaintiff's daily life, budget, money, resources, household, supplies, medications, meals, enabling the Plaintiff to recover a significant amount of strength in her legs, so that she could support her weight and remain living safely in her family home thanks to receiving individually tailored and necessary services.

49. For over 15 years, since about March of 2006, and until July 13, 2021, Plaintiff received the various and complex Acquired Brain Disorder Medicaid Waiver services through her adult FCP and the coverage therefor through Gateways.

50. The Defendant, Gateways Community Services, had developed an Individual Service Plan/ Individual Service Agreement ("ISA"), a.k.a. "Plan of Care," describing Plaintiff's conditions and her service needs in detail. In accordance with this Plan of Care, the FCP, aided by 24/7 hourly staff, cared for the Plaintiff under an annual contract of adhesion with the Defendant, providing the care described in the Plaintiff's ISA.

51. The FCP recruited, trained, supervised, and scheduled the 24/7 hourly staff to provide several specific aspects of the Plaintiff's personal care, all in full accordance with her Individual Service Plan. All of these complex and comprehensive services were (and are) described in Plaintiff's Individual Service Plan/ Individual Service Agreement ("ISA") and were necessitated by the Plaintiff's brain injury, enabling her to live in the most integrated setting — her family home.

52. The FCP services are referred to in the Internal Revenue Code Section 131 as "difficulty of care payments" and defined as the "additional care made necessary by [Plaintiff's] disability." From March of 2006 and until July 13, 2021, the

Defendant, Gateways Community Services, executed an annual
Contract with the FCP for the Plaintiff's adult foster care
services and made monthly IRC Section 131 "difficulty of care
payments" to the FCP, as described in the IRC section 131.
These monthly Contract payments to the FCP ranged from $4,000/
month at the beginning to $5,100/ month in the later years.
These payments, in accordance with the IRC Section 131, were
treated as "difficulty of care payments."  Section 131 of the
IRC also describes the "difficulty of care" payments as
"payments for the care of disabled person(s) living in the home
of the care-provider(s)."

53.  Thus, the FCP Contract terms required the FCP and the
Plaintiff to live together in order to provide the various
necessary brain injury care including, but not limited to,
according to FCP's contract with Gateways:

>   "assistance with eating, bathing, dressing,
> toileting, transferring, maintain continence, personal
> hygiene, light housework, using the telephone, medication
> management, and money management.
>   Habilitation Services includ[ing] assistance in
> acquiring, retaining, and maintaining the self-help,
> socialization, and adaptive skills necessary to reside
> successfully in home and community based settings."

54.  All of the specifics of the Plaintiff's service needs and
service provision were [and continue to be] stated in her ISA.
These care specifics are also referenced in Appendix C of the
annual FCP Contract with Gateways.  The FCP delivered these

services to Plaintiff in accordance with this "Plan of Care"/
ISA, the annual FCP contract, and with all of the applicable
regulations of the NH DHHS Division of Developmental Services.
The latter State regulations implement the Federal Medicaid
laws and Regulations, and the ABD Medicaid Waiver Contract
terms existing between the US HCFA and the NH DHHS in the State
of New Hampshire.  These state laws and regulations define and
regulate every aspect of the federally-funded care, in full
accord with the federal requirements, from eligibility, to
individual budget development, to administration, and delivery
of care to quality control and measures for crisis management
in New Hampshire.  These state laws and regulations are
inextricably linked with and derive from the Federal Medicaid
requirements, and the terms of the contract existing between
the US HFCFA and NH DHHS for the brain injury services.  Thus,
the FCP's Contract with Gateways required the FCP to live with
the Plaintiff.

55.  Some of the terms maintained: "The Provider shall maintain
an environment supporting the individual's health, safety and
quality of life and shall provide services as follows:

A.    An environment supportive of the individual's
      rights and personal development.

B.   Opportunities for the individual to interact with and be involved in house and family routines and activities;

C.   An appropriate level of support and assistance at all times, per the individual's Service Agreement which is referenced and made part of this contract;

D.   Opportunities and assistance for the individual to choose and participate in typical community, recreational, and employment activities;

E.   Transportation for the individual or arrangements for such transportation.

LVI. Scope of Service:

A.   The Agency referral of this individual to the Provider is based on the unique needs of the individual as identified by the individual and or guardian.

B.   Requirements for the delivery of services:

1.   The Provider agrees to prepare and submit on a timely basis to the Agency, all reports required by the Agency or its funding sources.  Agency requirements are specified in Appendix B: <u>Compensation: Method, Schedule, and Conditions Precedent To Payment.</u>

2.   …

3.   …

4.   The Provider agrees to arrange for time off, keeping in mind the safety and needs of the individual.  The Area Agency will assist the Provider as appropriate to the needed time off situation.

C.   Required Program Standards:

1.   …

2.   …

3.   …

4.    The Provider shall be knowledgeable of, and
      adhere to all regulations applicable to
      providing services to people with
      developmental disabilities in New Hampshire
      including, but not limited to the following:

      a.    He-M 202   Individual Rights Protection
            Procedures
      b.    He-M 305   Personal Safety Emergencies
      c.    He-M 310   Rights of Persons Receiving
            Developmental Services in the Community

D.    In connection with the performance of the
      Services, the Provider shall comply with all
      statutes, laws, regulations, and orders of
      federal, state, county or municipal authorities
      which impose any obligation or duty upon the
      Provider."

57.   The regulations mentioned in the paragraph above

implementing the Federal Medicaid Laws in the State of New

Hampshire, regulate the use of the federal and state funds for

the care of the ABD Waiver disabled program participants.

Among these regulations, there is, for example, the NH He-M

1001 detailing the required minimum standards for all community

residences, including family residences serving at least one

individual, in the state of NH.

58.   By July 13th, after the plaintiff's long-standing FCP

resigned in accordance with the contract terms providing for

this, the Plaintiff's family chose another FCP, Vera

Zavivalkina, (hereinafter "Vera") who also lives with

Plaintiff, to take over Plaintiff's adult foster care services

and care for the Plaintiff in accordance with her well-

established Individual Service Plan/ ISA.  The original and long-standing FCP extensively trained Vera and thereafter resigned from the Plaintiff's care by July 13th, leaving the Plaintiff in the care of Vera.  Vera's documents and application to serve Plaintiff as her new FCP were submitted long in advance of July 13th, the final day of the prior FCP. This substitution of providers was discussed and planned for in cooperation with Plaintiff's Case Manager at Defendant Gateways, Lynne Riendeau.

59.  Subsequently, after extensive back and forth correspondence between Gateways and Plaintiff's Durable Power of Attorney Tatiana Taranov, regarding Vera's service terms, absent any payment from Gateways for Vera's services, on August 31, Plaintiff's alternate Durable Power of Attorney, Leonid Taranov, received a letter signed by Sandra Pelletier, Director of Gateways stating that most of the services Lidia had received through her FCP since 2006 were being denied.

60.  Subsequent letters from Defendant Mindy Huckins clarified the Defendants' position that Vera's services "do not qualify for foster care."  And, since July 14, Defendants made *no* payments from the Plaintiff's substantial budget for *any* of her services other than her 24/7 hourly staff and its "general management" at 9% of staff pay-roll.  This leaves about $4,500

of unused funds every month in the Plaintiff's allocated budget.

61.   This August 31 letter signed by Defendant Ms. Pelletier mentioned denying the coverage for several essential services described in Plaintiff's Individual Service Agreement and the Gateways/FCP annual Contract that Plaintiff had theretofore received through her FCP.  On its face, the letter only appears to deny only several essential services heretofore provided by the FCP, and does not refer to denying the entire complex and full array of "adult foster care services" per se.  However, the subsequent "clarifying" e-mails from Mindy Huckins clarified that, indeed, the Defendants would not pay Vera for adult foster care services/ were denying coverage for adult foster care services.

62.   This August 31 letter signed by Defendant Sandra Pelletier only "allowed" for Lidia's continued 24/7 hourly staff and its general management at 9% of payroll, plus 15 hours/ week of an unknown service Defendant Pelletier titled in her letter "Program Management," and an unknown heretofore service titled "relief staff" at 25 hours/ week, allocating $2,500/month for this from the Plaintiff's individualized budget.

63.   However, Defendants have made no payments for *any* services other than hourly staff and its general management since July 14th.

64.   In addition, there was and is no way to use the "relief staff" service and coverage because it merely partially duplicates the 24/7 staffing care and the funding allocated therefor.   Thus, the "relief staff" service has never been used, and there can be no providers for it where staff hours can never exceed 168 hours per week.

65.   No payment for the "Program Management" has been received from the Defendants either from July 14th and to present day.

66.   This August 31 letter from Defendant Pelletier, thus, determined to leave Plaintiff — who, according to her ISA, is at risk of exploitation by strangers, risk of fall, risk of choking on food, risk of medical emergencies, risk of grave injury — one-on-one in the care of her hourly staff during 153 hours per week (during the times when the proposed "Program Manager" would be off).   Yet, in fact, the Defendant Gateways has not made *any* payments since July 14th for any service other than the 24/7 staff and its general management at 9%, meaning that, in effect, Defendants left the Plaintiff alone in the hands of her low-skill entirely unsupervised and unlicensed personnel for the entire 168 hours each week since July 14th!

67.   Plaintiff's hourly low-skilled unlicensed staff have a
high turn-over rate and are frequently complete strangers,
unlicensed, and with no training to care for the Plaintiff.
They typically have no experience in brain injury care and may
have no experience at all in personal care, especially in the
care of a severely cognitively, behaviorally, physically, and
emotionally handicapped individual with a brain injury, such as
Lidia.   The hourly staff possess no qualifications to
independently provide brain injury care without training,
oversight, support and appropriate supervision.   In Plaintiff's
experience, the hourly staff may arrive tardy, walk out form
work unexpectedly, call out in advance, entirely fail to show
up without a prior call, ask to be re-scheduled, hit Plaintiff,
drop Plaintiff, allow her to fall out of her chair, or off her
treadmill, or allow her to become incontinent for lack of
timely assistance; fail to recognize signs of medical
emergency.   These are just a few examples of the various
incidents that Plaintiff has experienced over the years, and
that her FCP had addressed and resolved over the years of
providing adult foster care services to Plaintiff.

68.   Leaving someone in Plaintiff's condition for 153 to 168
hours per week, one-on-one with barely-known, unsupervised,
low-skill, unlicensed, and inexperienced staff is tantamount to

giving her a sentence to suffer abuse, grave injury, or death caused by improper care/ absence of skilled-nursing level of care, absence of individually tailored services of adequate quality.

69. Depriving Plaintiff of access to her usual, well-established, and necessary adult foster care services described in her Individual Service Plan/ Agreement constitutes denial of access to covered and needed benefits and services under a federally-funded program wherein she is a fully-qualified participant. This willful and malicious deprivation of rights, benefits, and care places Plaintiff's life in grave danger and gravely violates her rights to due process of law and to equal access to benefits in a federally-funded program. Plaintiff is unable to live alone, to manage any aspects of her life or her complex 24/7 skilled nursing level of care.

70. The Defendants Sandra Pelletier and Mindy Huckins, insist in their correspondence with the Plaintiff's Durable Power of Attorney, that "the services Vera provides do not qualify for adult foster care payments, because Section 131 of the IRC does not allow coverage for these services to Plaintiff."

71. The defendants, in their subsequent letters to Plaintiff's Durable Powers of Attorney, have refused to discuss with Plaintiff's DPOA which *specific* language in the IRC allows them

to deprive Plaintiff of her adult foster care services.  They
have refused to structure the Plaintiff's vast allocated budget
(which nears $250,000 per year) in a way that she could
continue receiving the skilled-nursing level of care she
requires, tailored to her individual needs, meeting equal
access to benefits, continuity, and quality of care
requirements of the ABD Waiver.  Essentially, the Defendants
are "choking the Plaintiff out" of her ability to live in the
most integrated setting. They are chocking the Plaintiff's
providers out of being able to continue caring for the
Plaintiff.

72.  Thus, the Defendant, Ms. Pelletier, by her August 31
letter on its face denied coverage for the most essential of
the services that Plaintiff has received for over 15 years
through her FCP, and also structured Plaintiff's substantial
(nearing 250,000/ year) allocated individualized budget in a
way that Plaintiff can't reach at least 4,500/month or more of
her benefits/ her allocated budget in order to pay for the
covered and needed services in adequate amount, duration, and
scope.

73.  Currently, therefore, at least $4,500/month of the
Plaintiff's budget remain out of her reach because the "relief
staff" service merely duplicates the funding already allocated

for her 24/7 staffing, the "program management" has not received *any* payments, the money management, household management, residence oversight, non-medical transportation to obtain groceries have all been denied, and no payments have been made for any services, other than low-skilled staff and its general management, since July 14th.

74. The Plaintiff is being deprived of a vast array of care she used to receive through her adult foster care provider, she is deprived of access to her federally-funded budget.

75. Absent a swift restoration of the Plaintiff's access to the necessary and life-saving adult foster care services and to all the needed and covered services in adequate amount, duration and scope in accordance with federal laws and Plaintiff's ISA, the Plaintiff remains exposed to grave risk of abuse, injury, and death and faces a grave risk of institutionalization at a place that would not provide the individualized services Plaintiff needs.

76. The ABD Waiver Contract terms, the federal and state laws and regulations require the Defendants to develop an individualized budget based on pricing out each individual needed service at market-based rates based on publicly available information.

77.    The Defendant's denial of access to the needed care and to
the federally-funded benefits, their willful and malicious
dismantling of Plaintiff's well-established care is egregious,
shocking to the conscience, and constitutes a federal crime
under USC Title 18, Section 242.  Their conduct is especially
malicious in view of the substantial budget allocated for
Plaintiff's care that they make impossible to reach for her
care.  The malicious and lawless nature of Defendants's actions
may warrant punitive damages, treble damages, and attorneys'
fees against the individual decision-makers and/or Gateways
Community Services.  It is unconscionable to leave the fragile
and defenseless Plaintiff one-on-one in the care of unlicensed,
unsupervised, inexperienced, and frequently changing hourly
staff, absent any support, oversight, management, for 168 hours
each week, while there is an adequate budget allocated for
Plaintiff's care, while her service needs are well-described by
the Defendants themselves in Plaintiff's ISA, where the
Plaintiff's care has been long-standing and well-established
since 2006, and where a plethora of laws strongly and clearly
protect Plaintiff's rights to her continued care.

78.    It is an atrocity for the government-funded agency and
officials clothed with State authority, to deprive the
defenseless Plaintiff, who they are supposed to serve and

protect, of her care and benefits, to put her at risk of grave harm and death by administering the vast budget allocated for her care in such a manner as to deprive her of the care, to deny her access to and payment for covered and necessary services.

79.   New Hampshire has an amazing federally-funded Acquired Brain Disorder Medicaid Waiver Program, yet these actors, clothed with state authority, willfully and maliciously abuse their positions in order to deprive Plaintiff of the very federal rights and benefits under color of law, that they are supposed to implement; continue to inflict grave harm upon her and her family, insist on putting the Plaintiff and her caregivers in harms way.

80.   Since March of 2006, for over 15 years, the FCP provided the following services and supplies to Plaintiff covered by the ABD Waiver and necessary for her safety and ability to live in her family home: transportation for Plaintiff to multiple dental, and therapy appointments; making and coordinating Plaintiff's multiple medical, dental, and therapy appointments; obtaining the groceries and household supplies for the Plaintiff; managing Plaintiff's money; implementing the Plaintiff's complex rehabilitation regimen; obtaining and administering medications and food supplements; obtaining and

maintaining adaptive equipment; coordinating all aspects of Plaintiff's life and her living environment; planning meals in accordance with Plaintiff's nutritional regimen; recruiting, training, and supervising the Plaintiff's frequently changing hourly staff to deliver the specialized and complex hands-on care and preventing abuse and neglect; managing staff, medical, and household emergencies, including during severe whether and power outages, managing medical emergencies, rescheduling staff as requested and/ or performing the back-up hands-on personal care during all staff emergencies, absences, tardiness, vacations, quitting, and during severe weather;  carrying home and worker's compensation insurance policies, and handling staff's un-employment claims when laid-off/ terminated.

81.   The FCP also paid for various hygiene and incontinence supplies, provided the monthly reports to Defendants, and managed Plaintiff's money, care needs, and communications with the Defendants.  All of these services and supplies are necessary for the Plaintiff's safety and survival, and are covered by state regulations implementing the ABD waiver.  All of these services and supplies are covered services under the ABD waiver.

82.   The Defendants have historically failed to make a budget for the Plaintiff where each needed and covered service must be

based on market-based amounts therefor, and priced out at market-based rates, based on publicly available information.

83.  But starting July 14th, 2021, the Defendants simply stopped paying for the most critical part of the Plaintiff's care, leaving a vast part of her allocated budget entirely out of her reach to pay for her care.

84.  The Defendants have historically refused to provide medical assistance/ coverage for any respite services in violation of the Waiver contract terms and state regulations.

85.  The defendant's have deprived Plaintiff of her substantive and procedural due process rights in stopping coverage for her care by July 14th, without any notice or any due process of law.

86.  The Defendants cut off medical assistance/ benefits to the Plaintiff for all of the Waiver services she had received since 2006 until July 13, 2021 beyond what they refer to as "hands-on" or "direct" 24/ personal care staff and their "general management" at 9%.

87.  These malicious and lawless actions under color of law have had the effect of dismantling Plaintiff's access to care. Contrary to these actions, the NH ABD Waiver provides that there shall be *no* individual cost limit for the program participants and that the need for the services shall determine

a participant's access thereto, and that the services will be individually tailored to meet the needs, interests, and life-style of the individual and be provided in adequate amount, duration, and scope.

## Injury to Plaintiff

88.  The termination of medical assistance for the needed and covered services strips the Plaintiff of all opportunities to select a provider of her choice, to have access to the skilled nursing level of care she requires, and to receive services in the most integrated setting.  This denial is also damaging and destroying the Plaintiff's natural supports, because her family are left scrambling to care for her without the needed support and resources. The lawless actions of Sandra Pelletier, Mindy Huckins, and the Gateways Community Services are forcing the Plaintiff out of her family home and into an institution against her will. This, in times of COVID may be a death sentence to her.  And even prior to that, she almost died at a specialized brain injury care group home, Rosemeadow Farm, due to the lack of individually tailored services she required (and continues to require) to live, when the Defendants failed to price out her services based on market-based rates and placed her into a setting where her care needs could be met.  Based, also on the Plaintiff's previous experience residing at the

Rosemeadow Farm for 75 days in 2005-2006, she is facing imminent and grave harm to her health, isolation, and premature death in the absence of the services she needs at an institution. Rosemeadow Farm has been referred to by several experts as one of the best brain injury homes in this region, and yet they had issued Plaintiff a notice to leave only seventy-five days' into her stay with them and refused to accept her back from the Elliot Hospital upon her recuperation. In addition, Plaintiff feels that she would rather die than be taken out of her home and away from her family.

Facts related to the denial of medical assistance.

89. The Defendants have a pattern and practice of refusing to furnish medical assistance to the Plaintiff as required by federal law.

90. The Plaintiff incorporates by reference herein the foregoing paragraphs 1-88 and further states that The Americans with Disabilities Act (A.D.A) was enacted to help serve "…the Nation's proper goals regarding individuals with disabilities, [which goals] are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for each individual." 42 U.S.C. Sec. 12101(a)(8). Title II of the Act applies to public entities, including NH

DHHS, and the programs which they operate, including the ABD

waiver. 42 U.S.C. Sec. 12131-12134.

91. The A.D.A.'s implementing regulations prohibit not just

explicit discrimination on the basis of disability, but also

methods of administration which, though neutral on their face,

are discriminatory in their effect.  28 C.F.R. Sec. 35.130(b)

(3) provides:

> A public entity may not, directly or through contractual
> or other arrangements, utilize criteria or methods of
> administration:
> (i) That have the effect of subjecting qualified
> individuals with disabilities to discrimination on the
> basis of disability;
> (ii) That have the purpose or effect of defeating or
> substantially impairing accomplishment of the objectives
> of the public entity's program with respect to individuals
> with disabilities; or
> (iii) That perpetuate the discrimination of another public
> entity if both public entities are subject to common
> administrative control or are agencies of the same State.

92. Furthermore, the Rehabilitation Act of 1973 implementing

regulations at 45 CFR Part 84 Nondiscrimination on Basis of

Handicap in Programs and Activities Receiving or Benefiting

From Federal Financial Assistance provides:

Subpart F - Health, Welfare, and Social Services
§ 84.51 Application of this subpart.
Subpart F applies to health, welfare, and other social
service programs or activities that receive Federal
financial assistance and to recipients that operate, or
that receive Federal financial assistance for the
operation of, such programs or activities.
[42 FR 22677, May 4, 1977, as amended at 70 FR 24320, May
9, 2005]
§ 84.52 Health, welfare, and other social services.

(a) General. In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap:

(1) Deny a qualified handicapped person these benefits or services;

(2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered non-handicapped persons;

(3) Provide a qualified handicapped person with benefits or services that are not as effective (as defined in §84.4(b)) as the benefits or services provided to others;

(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons; or

(5) Provide different or separate benefits or services to handicapped persons except where necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others.

## V. CLAIMS FOR RELIEF

### First Claim for Relief

93. Now comes the plaintiff and incorporates by reference herein all of the foregoing allegations in paragraphs 1-92 and claims that Defendant's termination of medical assistance to Plaintiff for needed and covered Medicaid Waiver services under the ABD program violates her federal statutory right to prompt medical assistance as secured by 42 U.S.C. § 1396a(a)(8) and its implementing regulations, 42 C.F.R. §§435.903, 435.911 and 435.930.

### Second Claim for Relief

94. Plaintiff incorporates by reference herein all of the foregoing allegations in paragraphs 1-92 and claims that

Defendant's termination of access to benefits violates Plaintiff's federal statutory right to prompt medical assistance as secured by 42 U.S.C. §1396a(a)(8) and her due process rights as secured by 42 U.S.C. §1396a(a)(3) and its implementing regulation, 42 C.F.R. §431.220(a).

## Third Claim for Relief

95.  Plaintiff incorporates by reference herein all of the foregoing allegations in paragraphs 1-92 and claims that acting under color of law, Defendants have deprived Plaintiff of prompt medical assistance for the covered and needed ABD waiver services without due process of law contrary to the Fourteenth Amendment to the United States Constitution.

## Fourth Claim for Relief

96.  Plaintiff incorporates by reference herein all of the foregoing allegations in paragraphs 1-92 and claims that The Defendant's refusal to furnish benefits for which the Plaintiff is eligible and qualified limits her participation in the ABD program, provides her with services which are less effective than those provided to other participants, deprives her of all ability to choose her providers, deprives her or ability to receive care in the most integrated setting, and discriminates against her on the basis of her disability, contrary to the

Fourteenth Amendment to the United States Constitution, the
Americans with Disabilities Act, and the Rehabilitation Act of
1973. The Defendants' actions under color of law to deprive
Plaintiff of her Federal rights are a crime under USC Title 18,
Section 242.

## Fifth Claim for Relief

97.  Plaintiff incorporates by reference herein all of the
foregoing allegations in paragraphs 1-92 and claims that The
Defendants' actions in failing to abide by the terms of the ABD
waiver, which is a valid contract between it and the U.S. CMS,
violate Plaintiff's rights in so far as she is the intended
third party beneficiary to this contract. Plaintiff also seeks
appropriate relief as third party beneficiary to contracts
between the DHHS and the BDS, and between the BDS and the AAGN.
The Plaintiff also alleges that, by denying medical assistance
and access to covered and needed services, the Defendants
violated each Waiver provision pertaining directly to the
required staff training; to the required emergency management
plan for specified emergency conditions; to the required
medication administration rules; to the appropriate community
residence oversight and coordination, to required household
management, to required money management, to required
transportation, to required safety and quality of care

measures.  The Defendants are also violating all of Plaintiff's
rights to free choice of providers, to preferred life-style,
and to prompt medical assistance for needed services and care.

## Sixth Claim for Relief

98.  Plaintiff incorporates by reference herein all of the
foregoing allegations in paragraphs 1-92 and claims that The
Defendants' actions in failing to provide the services of
adequate amount, scope, and duration are violating her rights
to due process of law and violating the express terms of the
Contract between US HCFA and NH DHHS where the Plaintiff is the
intended third party beneficiary to the said Contract.

**NOW THEREFORE**, Plaintiff respectfully requests that this
Honorable Court:

1.  Retain jurisdiction over this action to ensure Defendants'
compliance with the mandates of the federal Medicaid Act, its
implementing regulations, the Americans with Disabilities Act,
The Rehabilitation Act of 1973, the law of Contract, and the
Due Process Clause of the Fourteenth Amendment to the United
States Constitution;

2.  Issue a declaratory judgment pursuant to 28 U.S.C. § 2201
that the Defendant's policies, acts, and practices under color

of law violate Plaintiff's rights granted by the federal Medicaid Act and its implementing regulations, the law of Contract, The Rehabilitation Act of 1973, the Civil Rights Act, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

3.    Issue a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Defendant's policies, acts, and practices violate also the Plaintiff's rights under the Federal Americans with Disabilities act and the Due Process Clause of the Fourteenth Amendment.

4.    Enter a Temporary Restraining order and/or a preliminary and a permanent injunction enjoining the Defendants, their agents, successors, and employees to retroactively to July 14th and forthwith fully comply with the applicable federal statutes, regulations, the law of Contract, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution in ensuring Plaintiff's access to her care and benefits as required by law;

5.    Award Plaintiff punitive, treble, and all other damages against the Defendants Gateways Community Services, Sandra Pelletier, and Mindy Huckins, in their individual and/ or official capacities.

6.    Award Plaintiff her costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 12205; and

7.    Order such other relief as the Court deems equitable and just.

8.    Award Plaintiff punitive and all other damages for the deprivation, under color of law, of her federal rights and benefits for her suffering and for maliciously devastating her family and her natural supports.

Respectfully Submitted,

_____       D.P.O.A       Date: __11.18.21__

Lidia Taranov, Pro Se Plaintiff
12 Cooper Lane, Apt 103
Bedford NH 03110
BY HER NEXT FRIEND,
Leonid Taranov
℅ Tatiana Taranov
12 Cooper Lane, Apt. 103
Bedford NH 03110
(617)943-7460
&
BY HER NEXT FRIEND,
Tatiana Taranov
12 Cooper Lane, Apt 103,
Bedford NH 03110
immstrategy@yahoo.com
(617)943-7453


### VERIFICATION

        I, Leonid Taranov, am over eighteen years old, and I am the Next Friend of the pro se Plaintiff in this action. The statements and allegations that pertain to her or which are made in this Verified Complaint for Declaratory Judgment and Injunctive Relief and /or damages if warranted have been examined and are true and correct and based upon my personal knowledge, unless otherwise

stated. If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of New Hampshire, that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Signature _____     Date: _11. 18. 21_____

NAME        Leonid Taranov
            Plaintiff's Next Friend

## VERIFICATION

NOW comes Tatiana Taranov, and states under oath and penalty of perjury as follows: I am over eighteen years old, and I am the Next Friend of the pro se Plaintiff in this action. The statements and allegations that pertain to her or which are made in this Verified Complaint for Declaratory Judgment and Injunctive Relief and /or damages (if warranted) have been examined and are true and correct to the best of my personal knowledge, unless otherwise stated. If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of New Hampshire, that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Signature _Tatiana Taranov_     Date: _11. 18. 21_____

NAME        Tatiana Taranov
            Plaintiff's Next Friend

## JURY TRIAL DEMAND

I demand a jury trial for all claims for which a jury trial is allowed

Date: _____ _11, 18.21_          Signature: _____

Lidia Taranov, Pro Se
By Next Friend,
Leonid Taranov,
℅ Tatiana Taranov
12 Cooper Lane, Apt 103
Bedford NH 03110
(617)943-7460 (mobile)
leotran58@yahoo.com