**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Lidia Taranov, by and through
Tatiana Taranov and Leonid Taranov,
Next Friends</u>

v.

Case No. 21-cv-995-PB
Opinion No. 2023 DNH 129

<u>Area Agency of Greater Nashua, a/k/a
Region VI Area Agency d/b/a
Gateways Community Services, Inc. et al.</u>

<u>**MEMORANDUM AND ORDER**</u>

Plaintiff Lidia Taranov is a blind and cognitively disabled elderly woman enrolled in New Hampshire's Acquired Brain Disorders (ABD) Waiver program, a state Medicaid program administered by the New Hampshire Department of Health and Human Services (DHHS). As part of the ABD Waiver program, DHHS contracts with private nonprofit "area agencies" to coordinate the provision of home and community-based care services to eligible individuals. Taranov has sued several DHHS officials, as well as the area agency that coordinates her ABD waiver services and its officials. The complaint alleges that the defendants terminated a subset of Taranov's ABD waiver services, the so-called adult foster care services, in violation of her federal statutory and constitutional rights. The defendants have moved to dismiss the complaint in its entirety. Because Taranov has failed to allege

any viable theories of liability, I grant the defendants' motions and dismiss the complaint.

## I.    BACKGROUND

### A.    The ABD Waiver Program

The New Hampshire legislature has charged DHHS with establishing and coordinating "a comprehensive service delivery system for developmentally disabled persons," with the goal of "emphasiz[ing] community living[.]" See N.H. Rev. Stat. Ann. § 171-A:1. In furtherance of this goal, DHHS created the ABD Waiver program, a system through which New Hampshire residents with ABD may receive Medicaid-covered home and community-based services. See generally N.H. Code Admin. R. He-M 517– N.H. Code Admin. R. He-M 522. The Waiver program is operated pursuant § 1915(c) of the Social Security Act, which permits a state to obtain a "waiver" exempting it from certain Medicaid requirements so that it may provide individuals who would otherwise require institutional care with services in the community. See 42 U.S.C. § 1396n(c).

The ABD Waiver program relies on a network of private nonprofit area agencies, designated and paid for by the state, to provide and coordinate services for eligible individuals in their service region. See generally N.H. Code Admin. R. He-M 505; see also N.H. Rev. Stat. Ann. § 171-A:2, I-b. "Area agencies are the primary recipients of funds dispensed by DHHS for use in

administering developmental services and programs, and as such, serve as the nucleus of services for individuals living in each service region." Petition of Sawyer, 170 N.H. 197, 199 (2017). Each area agency is governed by a board of directors that is comprised of private community members. N.H. Code Admin. R. He-M 505.03(h)—(m). Nonetheless, the state regulates the operation of the ABD Waiver program and retains significant control over area agencies. See, e.g., N.H. Code Admin. R. He-M 505.03 (describing the role of area agencies and DHHS oversight); N.H. Code Admin. R. He-M 505.06 (specifying when the DHHS commissioner may revoke the designation of an area agency); N.H. Code Admin. R. He-M 505.07 (same for the suspension of an area agency's designation); N.H. Code Admin. R. He-M 505.08 (describing the redesignation process).

To obtain ABD waiver services, an individual must first apply to the area agency in his or her service region. See N.H. Code Admin. R. He-M 522.04. If the area agency determines that the person has an ABD, it must so inform DHHS, which in turn must determine whether the person meets various other eligibility criteria. See N.H. Code Admin. R. He-M 522.05(h)(1); N.H. Code Admin. R. He-M 522.06(a). If DHHS determines that the person is eligible for Medicaid-covered home and community-based services, the area agency so notifies the individual. N.H. Code Admin. R. He-M 522.06(b)(1).

The area agency must create a "service agreement" for each enrolled individual. See N.H. Code Admin. R. He-M 522.11. This is a written agreement between the area agency and the individual (or the individual's guardian or representative) that "describes the services that [the] individual will receive[.]" N.H. Code Admin. R. He-M 522.02(ah). Service agreements are subject to periodic review and revision, through which previously authorized services may be terminated when warranted by changed circumstances. N.H. Code. Admin. R. He-M 522.16. Should an area agency decide to terminate services, it must send a termination notice to the individual at least 30 days before the effective date of termination. Id.

To the extent an individual disapproves of a proposed service agreement or termination decision, she can file an appeal with DHHS's Administrative Appeals Unit. See N.H. Code Admin. R. He-M 522.18. Upon receipt of an appeal, DHHS "assign[s] a presiding officer to conduct a hearing or independent review" in accordance with its rules of practice and procedure. N.H. Code Admin. R. He-M 522.18(f). If the individual has requested a hearing on the appeal, DHHS rules provide that "[c]urrent recipients, services, and payments shall be continued . . . until a decision has been made[.]" N.H. Code Admin. R. He-M 522.18(g)(1).

**B.    The Complaint**

Taranov has an ABD and requires around the clock care and supervision. As a participant in the ABD Waiver program, Taranov receives a variety of home and community-based services through service agreements executed by Gateways Community Services, Inc. (Gateways), the designated area agency in her geographic region.

In July 2021, Gateways terminated a subset of Taranov's services, the so-called "adult foster care services," after the previous adult foster care provider resigned and was replaced with a new provider. The complaint describes adult foster care services as a complex array of services that include coordination and management of all aspects of Taranov's daily life, including the hiring, training, and supervision of personal caregivers who tend to Taranov's needs 24/7. Gateways proposed to cover a substitute set of services that it deemed comparable to adult foster care services. Taranov, through her guardian, rejected this proposal, deeming it inadequate to allow her to safely remain in her home. Gateways has continued to pay for Taranov's personal care services but has not paid for the new provider's adult foster care services. Consequently, Taranov has been burdened with mounting debt to her new provider.

Despite receiving notice from Gateways that she had the right to appeal the termination of her adult foster care services to DHHS, Taranov has not done so. Instead, through her adult daughter and ex-husband as next

friends, Taranov filed this action in November 2021 against Gateways, Gateways' President and CEO, Sandra Pelletier, and Gateways' Senior Director of Family and Participant-Directed Services, Mindy Huckins. Plaintiff subsequently amended her complaint to add as defendants DHHS Commissioner Lori Shibinette and DHHS Director of Developmental Services Sandy Hunt, who are sued in their official capacities only.

The complaint asserts the following claims for relief: (1) a deprivation of prompt medical assistance in violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(8); (2) a deprivation of the ability to choose a preferred medical provider in violation of the Medicaid Act, 42 U.S.C. § 1396a(a)(23); (3) a denial of due process of law in violation of the Fourteenth Amendment; (4) a denial of the equal protection of law in violation of the Fourteenth Amendment; (5) discrimination on the basis of disability in violation of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 et seq.; and (6) breach of contract, premised on the theory that Taranov is a third-party beneficiary of contracts between (a) DHHS and Gateways, (b) DHHS and the federal Centers for Medicare and Medicaid Services (CMS), and (c) DHHS and the Bureau for Developmental Services (BDS).[1]

---

[1]    The complaint groups these theories of liability into seven claims for relief. As the defendants point out, the complaint groups some distinct

Following a preliminary review of the complaint, I dismissed Taranov's disability discrimination claims against the Gateways defendants for failure to state a claim. I later denied the DHHS defendants' motion to dismiss the complaint on ripeness grounds, and I denied the Gateways defendants' Rule 12(b)(6) motion to dismiss without prejudice. Both the DHHS and Gateways defendants have now moved for dismissal under Rule 12(b)(6) for failure to state a claim. Taranov objects.

## II.   <u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must make factual allegations sufficient to "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)</u> (quoting <u>Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)</u>). This standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." <u>Id.</u> A claim is facially plausible if it pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

In testing a complaint's sufficiency, I employ a two-step approach. <u>See</u> <u>Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011)</u>. First, I

---

theories within a single claim, while other claims are duplicative. Because Taranov does not dispute the defendants' characterization of her claims or otherwise show that there are seven distinct causes of action, I base my analysis on these six causes of action.

screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action." Id. (cleaned up). A claim consisting of little more than "allegations that merely parrot the elements of the cause of action" may be dismissed. Id. Second, I credit as true all non-conclusory factual allegations and the reasonable inferences drawn from those allegations, and then determine if the claim is plausible. Id. The plausibility requirement "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" of illegal conduct. Twombly, 550 U.S. at 556. The "make-or-break standard" is that those allegations and inferences, "taken as true, must state a plausible, not a merely conceivable, case for relief." Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010).

### III.  <u>ANALYSIS</u>

Each defendant argues that Taranov's complaint must be dismissed in its entirety for failure to state a claim. The Gateways defendants assert that they cannot be liable under the Fourteenth Amendment or the Medicaid Act because they were not acting under color of state law. They further argue that Taranov is not a third-party beneficiary to its contract with DHHS and therefore cannot sue for its breach. The DHHS defendants, in turn, argue that Taranov's constitutional and statutory claims against them must be dismissed because Taranov has not alleged that their actions caused her

claimed injury. As to Taranov's contract claims, the DHHS defendants assert that Taranov has neither identified an enforceable contract nor established that she is a third-party beneficiary of any such contract. I address the Gateways defendants' arguments first before turning to the DHHS defendants' arguments.

## A.   The Gateways Defendants' Motion to Dismiss

### 1.   Federal Claims

Taranov's surviving federal claims against the Gateways defendants challenge their decision to terminate coverage for her adult foster care services under the Due Process Clause, the Equal Protection Clause, and the Medicaid Act. The Gateways defendants argue that they cannot be held liable because they are non-state actors. I agree.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Supreme Court has "affirmed the essential dichotomy set forth in that Amendment between deprivation by the State, subject to scrutiny under its provisions, and private conduct, 'however discriminatory or wrongful,' against which the Fourteenth Amendment offers no shield." Jackson v. Metro. Edison Co., 419 U.S. 345, 349 (1974) (quoting Shelley v. Kraemer, 334 U.S. 1, 13 (1948)). Although there is no "universally applicable litmus test to

distinguish state action from private conduct," Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 (1st Cir. 1999), the Supreme Court has identified "a few limited circumstances" that allow a private entity to qualify as a state actor: (1) when the private entity assumes a traditional, exclusive public function; (2) when the state compels the challenged private conduct; or (3) when the state is a joint participant in the challenged activity. Manhattan Cmty. Access Corp. v. Halleck, 139 S. Ct. 1921, 1928 (2019). The allegations in Taranov's complaint are insufficient to satisfy any of these tests.

Under the public function test, "it is not enough that the function serves the public good or the public interest in some way." Id. at 1928-29. Instead, the state "must have traditionally and exclusively performed the function." Id. at 1929 (emphasis in original). "Exclusivity is an important qualifier, and its presence severely limits the range of eligible activities." Santiago v. Puerto Rico, 655 F.3d 61, 69 (1st Cir. 2011). The case law suggests that functions that fall in this category are few and far between: administering elections, Terry v. Adams, 345 U.S. 461, 468-70 (1953); operating a company town, Marsh v. Alabama, 326 U.S. 501, 505-509 (1946); exercising eminent domain, Jackson, 419 U.S. at 353 (dicta); using peremptory challenges in jury selection, Edmonson v. Leesville Concrete Co., 500 U.S. 614, 622 (1991); and, in some circumstances, operating a municipal park, Evans v. Newton, 382 U.S. 296, 301 (1966). By contrast, a host of public

functions have been found to not be exclusive to the government, including

"running sports associations and leagues, administering insurance payments,

operating nursing homes, providing special education, representing indigent

criminal defendants, resolving private disputes, and supplying electricity."

Halleck, 139 S. Ct. at 1929 (collecting cases).

At the motion to dismiss stage, the plaintiff has the burden "to advance

historical and factual allegations in their complaint giving rise a reasonable

inference that [the private conduct] is traditionally exclusively in the

province of the State." Marie v. Am. Red Cross, 771 F.3d 344, 362 (6th Cir.

2014). Taranov has failed to clear that hurdle.

As an area agency, Gateways is a non-profit corporation that contracts

with the state "to provide or coordinate services to developmentally disabled

persons" in its service area. See N.H. Rev. Stat. Ann. § 171-A:2, I-b. Providing

or coordinating Medicaid waiver services is not a function that has been

traditionally and exclusively reserved for the government. See Gonzalez-

Maldonado v. MMM Healthcare, Inc., 693 F.3d 244, 248 (1st Cir. 2012)

(holding that operating a health management organization that provides or

coordinates health care for Medicare recipients through a contract with the

federal government does not qualify as a traditional public function); see also

Bourbon Cmty. Hosp., LLC v. Coventry Health & Life Ins. Co., No. 3:15-cv-

00455-JHM, 2016 WL 51269, at *3 (W.D. Ky. Jan. 4, 2016) (collecting cases

for the proposition that a managed care organization that provides healthcare to Medicaid beneficiaries pursuant to a contract with the state is not performing a traditional public function).

Taranov's complaint fares no better under the second test for determining whether a private entity is a state actor. The state compulsion test asks "whether the state has used coercive power or has provided such a substantial degree of encouragement that the private party's decision to engage in the challenged conduct should fairly be attributed to the state." Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 12 (1st Cir. 2015) (citing Rendell-Baker v. Kohn, 457 U.S. 830, 840 (1982)). Neither the complaint's allegations nor the regulatory scheme pursuant to which area agencies operate suggests that the state compelled the challenged conduct. On the contrary, various allegations in the complaint seem to place the challenged decision exclusively on the Gateways defendants, without suggesting that the state was commandeering or influencing the outcome.[2]

---

[2]    In her objection to the DHHS defendants' first motion to dismiss, Taranov asserted for the first time that her adult foster care services were terminated only after "extensive review" and "guidance" from DHHS. Doc. 35 at 11. She reiterated these same allegations in her objection to the instant motion to dismiss. Doc. 79 at 11. Taranov also attached to her first objection an email from Pelletier referencing Gateways' communications with DHHS. Doc. 35-1 at 8. But, in ruling on the sufficiency of a complaint, courts are not permitted to consider allegations that appear for the first time in an objection to a motion to dismiss. See Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 483 (6th Cir. 2020). Nor are courts permitted to consider extrinsic documents

Lastly, the complaint does not advance sufficient factual allegations to invoke the joint action test. To satisfy this test, "a plaintiff must show that the state has so far insinuated itself into a position of interdependence with the private party that it was a joint participant in the challenged activity."[3] Jarvis, 805 F.3d at 8-9 (cleaned up). The "most salient" factor in determining whether the state is a joint participant in private conduct "is the extent to which the private entity is (or is not) independent in the conduct of its day-to-day affairs." Santiago, 655 F.3d at 71 (quoting Perkins, 196 F.3d at 21); see Brentwood Academy, 531 U.S. at 298 (finding state action where eighty-four

---

not expressly incorporated into the complaint. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Because neither the complaint nor any of the documents it incorporates allege that DHHS consulted on the decision to terminate Taranov's services, I do not consider such allegations. See Birch St. Recovery Corp. v. Thomas, 2000 DNH 176, 2000 WL 1513799, at *9 n.15 (D.N.H. July 29, 2000) ("Plaintiffs may not cure deficiencies in their complaint by appending evidentiary material to their opposition brief.").

[3]     The nomenclature for the joint action test has somewhat varied. See, e.g., Santiago, 655 F.3d at 71 n.6 (acknowledging that the First Circuit has referred to it as both the "nexus/joint action" test and the "symbiotic relationship test"). Additionally, although the Supreme Court at one point suggested that the public entwinement test is distinct from the joint action test, the Court's more recent precedent has eschewed that distinction. Compare Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 298 (2001) (finding that a nonprofit interscholastic athletic association was "pervasive[ly] entwine[d]" with governmental institutions and officials), with Halleck, 139 S. Ct. at 1928 (omitting the entwinement test as distinct from the joint action test). In evaluating Taranov's complaint, I consider the substance of the factors that courts have used in applying these tests.

percent of voting members of a nonprofit interscholastic athletic association were representatives of public schools); Evans, 382 U.S. at 301 (deeming a park that was municipally maintained but whose ownership was nominally passed over to private trustees to be a public institution).

Here, there are no allegations that the state is involved in the day-to-day affairs of the area agency. Unlike in Brentwood, the regulations show that each area agency is overseen by a board of directors composed of private individuals. See N.H. Code Admin. R. He-M 505.03(m)(5). The regulations even preclude DHHS employees and their spouses from serving on the area boards. Id. And the complaint does not otherwise allege facts establishing sufficient state entanglement in the day-to-day operations of Gateways specifically or area agencies generally.

To be sure, area agencies receive and manage government funds, and the state regulates various aspects of their role as service coordinators. "[B]ut neither government regulation standing alone, Jackson, 419 U.S. at 350, nor government funding, Rendell-Baker, 457 U.S. at 840, converts a private entity into an arm of the state[.]" Gonzalez-Maldonado, 693 F.3d at 248. As the Supreme Court's most recent case on state action explains, even "a heavily regulated, privately owned" entity is not "transform[ed] . . . into a state actor." Halleck, 139 S. Ct. at 1932. The regulatory scheme here, although comprehensive, "stop[s] short of giving the state any interest or role

in the day to day operations of [the private entity] or its decision-making as to how it runs its business." Crissman v. Dover Downs Entm't Inc., 289 F.3d 231, 236 (3d Cir. 2002). As such, it is insufficient to convert Gateways into a state actor.

Contrary to Taranov's suggestion, the state has not clothed Gateways with the authority of the state such that its private actions can be fairly attributed to the state. Most importantly, the state has reserved for itself the right to conduct de novo review of any "determination, action, or inaction" of an area agency. See N.H. Code Admin. R. He-M 522.18(a). Any ABD waiver participant who disagrees with an area agency can appeal to the state, and their existing benefits or service are continued while the administrative appeal is pending. See N.H. Code Admin. R. He-M 522.18(g)(1). On appeal, the state makes its determination without giving any deference to the area agency. See N.H. Code Admin. R. He-M 522.18(f). Thus, the actions of the area agency do not "effectively" deny or reduce coverage for ABD waiver services because the regulations "provide for review or ratification of these determinations made by" the area agency. See Catanzano by Catanzano v. Dowling, 60 F.3d 113, 119 (2d Cir. 1995). In other words, because the state retains ultimate control over final decisions, it has not "delegated its power to deny services to" the area agency. Id. Under the scheme at issue here, no plausible inference can be drawn that the private entity has such a close

nexus to the state that it can be deemed a state actor. As such, Taranov's due process and equal protection claims against the Gateways defendants fail for lack of state action.

The same is true with respect to Taranov's Medicaid Act claims. Taranov does not dispute the defendants' contention that § 1983 is the only vehicle for asserting those claims. This is unsurprising, considering that the First Circuit and other courts of appeals have recognized that the Medicaid Act provisions at issue here are enforceable in a § 1983 action. See Bryson v. Shumway, 308 F.3d 79, 89 (1st Cir. 2002) ("there is a § 1983 cause of action arising from the 'reasonable promptness' provision of 42 U.S.C. § 1396a(a)(8)[.]"); Planned Parenthood S. Atl. v. Baker, 941 F.3d 687, 696 (4th Cir. 2019) (collecting cases and holding that the Medicaid Act's free choice of provider provision conferred private right enforceable through § 1983). Because Taranov does not argue that the Medicaid Act itself provides either an express or an implied private right of action, I agree that her claims must be evaluated under the § 1983 standard.[4]

---

[4]     There is little doubt that the Medicaid Act does not expressly provide for a private remedy. See, e.g., City of Rancho Palos Verdes, Cal. v. Abrams, 544 U.S. 113, 121 (2005) ("The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983."). Although I did not find any case law addressing the existence of an implied private right of action under the provisions that Taranov cites, courts have rejected the notion that other Medicaid Act provisions create such causes of action. See,

Section 1983 is a vehicle for imposing liability against anyone who, under color of state law, deprives a person of "rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983; see Maine v. Thiboutot, 448 U.S. 1, 1 (1980) (recognizing that § 1983 "encompasses claims based on purely statutory violations of federal law"). To state a viable § 1983 claim, "a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued." Santiago, 655 F.3d at 68. Where a plaintiff asserts a § 1983 claim against a private party, the plaintiff must establish that "the alleged infringement of federal rights [was] fairly attributable to the State[.]" Rendell-Baker, 457 U.S. at 838 (cleaned up).

The Supreme Court has held that "[i]n a § 1983 action . . . the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical." Lugar v. Edmondson Oil Co., 457 U.S. 922, 929 (1982); see also Logiodice v. Tr. of

---

e.g., Harding v. Summit Med. Ctr., 41 F. App'x 83, 84 (9th Cir. 2002) (holding that the Medicaid Act provision establishing requirements for state medical assistance plans did not create an implied private right of action against private health care providers); see also Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel, 570 F.3d 520, 525 n.2 (3d Cir. 2009) (quoting Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 188 n.17 (3d Cir. 2004)) (recognizing that residents of nursing homes cannot directly sue to enforce federal standards and noting that "the distinction between implied private rights of action and § 1983 private rights of action rests not in the articulation of rights, but in the availability of a remedy").

Maine Cent. Inst., 296 F.3d 22, 26 (1st Cir. 2002) ("In most contexts, section 1983's 'under color of state law' requisite is construed in harmony with the state action requirement of the Fourteenth Amendment."). Accordingly, for the same reasons that Taranov has failed to allege that the Gateways defendants are state actors for purposes of her Fourteenth Amendment claims, she has likewise failed to allege that they can be held liable under § 1983.

      2.   <u>Contract Claims</u>

      The sole remaining claim against the Gateways defendants is based on the theory that Taranov is a third-party beneficiary of an allegedly breached contract between DHHS and Gateways. I agree with the defendants that this claim is meritless because the contract itself precludes this theory of liability.

      As a nonparty to the contract between DHHS and Gateways, Taranov must demonstrate that she is an intended third-party beneficiary of that agreement in order to sue for its breach. <u>See</u> Numerica Sav. Bank, F.S.B. v. Mountain Lodge Inn, Corp., 134 N.H. 505, 511 (1991); Moore v. Mortg. Elec. Registration Sys., Inc., 848 F. Supp. 2d 107, 127 (D.N.H. 2012). "Third-party beneficiaries are nonparties to a contract who are nevertheless allowed to sue to enforce it because the parties intended them to have that right." Brooks v. Tr. of Dartmouth Coll., 161 N.H. 685, 697 (2011) (quoting MacGregor v. Rutberg, 478 F.3d 790, 794 (7th Cir. 2007)). "Ordinarily a person's

entitlement to sue to enforce a contract to which she's not a party must be expressed in the contract rather than implied." Id. at 698 (cleaned up).

The relevant contract, which Taranov has incorporated into the complaint by reference, expressly provides that "[t]he parties hereto do not intend to benefit any third parties and this Agreement shall not be construed to confer any such benefit." Doc. 68-1 at 29. Because the parties to the contract unambiguously expressed an intent not to confer a third-party beneficiary status, Taranov is, at most, an incidental beneficiary who cannot sue for its breach. Accordingly, her breach of contract claim against Gateways necessarily fails.

## B.    The DHHS Defendants' Motion to Dismiss

### 1.    Section 1983 Claims

Taranov seeks to hold the DHHS defendants liable under § 1983, claiming that they violated her rights under the Fourteenth Amendment and the Medicaid Act.[5] The DHHS defendants argue that her claims must be

---

[5]    As I explained, Taranov's Medicaid Act claims necessarily proceed under § 1983. Although Taranov does not directly state as much in her complaint, it appears as though her Fourteenth Amendment claims against the DHHS defendants are also brought pursuant to § 1983. Because the Fourteenth Amendment does not provide for a private right of action, courts have recognized that "§ 1983 provides the exclusive remedy for constitutional violations for rights protected by the Fourteenth Amendment[.]" Smith v. Kentucky, 36 F.4th 671, 675 (6th Cir. 2022) (cleaned up); see also Udeigwe v. Tex. Tech. Univ., 733 F. App'x 788, 792 (5th Cir. 2018); Campbell v. Bristol Cmty. Coll., No. 16-11232-FDS, 2018 WL 457172, at *2 (D. Mass. Jan. 17,

dismissed because the complaint fails to allege that they caused her to be deprived of her rights.

The deprivation that forms the basis of Taranov's § 1983 claims is, as she puts it, "the termination of Medicaid payments for [her] long standing adult foster care." Doc. 79 at 14. In her complaint, Taranov repeatedly asserts that Gateways—and not DHHS—made the decision to terminate her benefits. See, e.g., Doc. 16 at 5 ("the Defendant Gateways, acting through Sandra Pelletier and Mindy Huckins, have stopped providing coverage for the Plaintiff's skilled-nursing level of care[.]"); id. at 7 ("the Defendants Gateways, Sandra Pelletier and Mindy Huckins lawlessly terminated coverage[.]") id. at 13 ("The defendants, Pelletier and Huckins . . . terminated Plaintiff's long-standing care and services and cut medical assistance for them[.]").

Taranov asserts that these allegations are sufficient to state a claim against the DHHS defendants because DHHS is "liable for the actions of their local Medicaid contractor," i.e., Gateways. Doc. 79 at 13. Accordingly,

---

2018). Taranov does not argue otherwise, nor does she contest the defendants' assertion that her claims arise under § 1983. Accordingly, I evaluate her Fourteenth Amendment and Medicaid Act claims under § 1983. See Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997) (noting that, when interpreting a pro se complaint, "the court may intuit the correct cause of action, even if it was imperfectly pled").

Taranov's complaint proceeds on the theory that the DHHS defendants are vicariously liable for Gateways' misconduct.

But it has long been settled law that "[l]iability under § 1983 cannot be based on the theory of vicarious liability," Ireland v. Prummell, 53 F.4th 1274, 1289 (11th Cir. 2022); see Bd. of Cnty. Commissioners of Bryan Cnty v. Brown, 520 U.S. 397, 403 (1997); Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); regardless of the relief sought, see L.A. Cnty. v. Humphries, 562 U.S 29, 34 (2010) (holding that Monell applies to claims for both damages and prospective injunctive relief). This is based on the text of § 1983, which only imposes liability on one who "subjects, or causes to be subjected, any citizen . . . to the deprivation of . . . rights[.]"  As the Supreme Court explained, "the fact that Congress did specifically provide that A's tort became B's liability if B 'caused' A to subject another to a tort suggests that Congress did not intend § 1983 liability to attach where such causation was absent." Monell, 436 U.S. at 692. In other words, because § 1983 only allows for liability where the defendant's own actions "caused" the alleged deprivation, "vicarious liability would be incompatible" with the text of the statute.[6] City of St. Louis v. Praprotnik, 485 U.S. 112, 122 (1988).

---

[6]    Although not raised by the parties, I note that both the First Circuit and the Supreme Court have recognized that the actions of private actors may, in certain circumstances, be imputed onto the state for the purposes of § 1983 liability. See Blum v. Yaretsky, 457 U.S. 991, 1003 (1982); Yeo v.

Accordingly, Taranov's complaint can only proceed to the extent it alleges that the named DHHS defendants have directly violated her rights under federal law. Where, as here, state officials are sued in their official capacities, see Doc. 16 at 1, 26, this requires allegations "that a policy or custom of the State contributed to the alleged violations of federal law[.]"[7] Danny B. ex rel. Elliot v. Raimondo, 784 F.3d 825, 834 (1st Cir. 2015); see also Hafer v. Melo, 502 U.S. 21, 25 (1991); Kentucky v. Graham, 473 U.S. 159, 166 (1985).

Taranov does not purport to advance any such theory, and her complaint lacks factual allegations to support such a theory. The complaint makes no mention of any official DHHS policies, and Taranov's objection seemingly disavows any challenge to official policies. See Doc. 79 at 13-14

---

Town of Lexington, 131 F.3d 241, 251 (1st Cir. 1997). But a private party's conduct is not imputed onto the state unless it constitutes state action under the Fourteenth Amendment. See Blum, 457 U.S. at 1004-1005 (applying the Fourteenth Amendment state action tests to determine whether the government could be held liable for the acts of private entities); Yeo, 131 F.3d at 252-253 (same). Thus, for the same reasons that Taranov failed to establish that Gateways is a state actor under the Fourteenth Amendment, she has failed to establish that the DHHS defendants are liable for its misconduct.

[7]    It is unclear from the caption of Taranov's complaint whether she also intended to sue the State of New Hampshire, DHHS, and/or BDS. See Doc. 16 at 1. Regardless, Taranov's § 1983 claims cannot proceed against any of these entities because they are not "persons" within the meaning of the statute. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989).

(stating that Taranov's suit is not "an action challenging the facial adequacy of the State's statutory procedures" and that "[t]he state due process procedures are perfectly adequate on their face"). Although the acts of high-ranking officials may sometimes give rise to a "policy" for the purposes of § 1983, Taranov does not directly identify any conduct by DHHS officials that allegedly contributed to her harm, much less establish that such conduct amounted to a policy or custom of the state. See Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (collecting cases and discussing how plaintiffs may establish a "policy" under § 1983). Indeed, the DHHS defendants are each referenced in the complaint only once. The singular allegation against Shibinette is that she is the commissioner of DHHS. Doc. 16 at 25. And the only allegations against Hunt are that (1) she is the Bureau Chief at BDS and (2) she sent an email stating that Taranov's proposed service agreement was not presented to DHHS because Taranov had not agreed to it, but noting that Taranov had the right to file an appeal if she disagreed with Gateways' determination. Id. at 26; Doc. 16-3 at 1. Such sparse allegations do not plausibly allege that DHHS employed a policy or custom that caused Taranov's harm. See M.D. by Stukenberg v. Abbott, 907 F.3d 237, 255 (5th Cir. 2018) ("the § 1983 causation component requires that the plaintiffs identify, with particularity, the policies or practices they allege

cause the constitutional violation, and demonstrate a direct causal link.")
(cleaned up).

At most, Taranov's complaint could be read to assert that the DHHS
defendants failed to proactively intervene after Gateways terminated her
services. To be sure, "where a policymaking official exhibits deliberate
indifference to constitutional deprivations caused by subordinates, such that
the official's inaction constitutes a 'deliberate choice,' that acquiescence may
'be properly thought of as a [government] policy or custom that is actionable
under § 1983.'" See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126
(2d Cir. 2004) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).
But "[d]eliberate indifference is a stringent standard of fault, requiring proof
that a [state] actor disregarded a known or obvious consequence of his
action." Connick v. Thompson, 563 U.S. 51, 61 (2011) (cleaned up).

As an initial matter, that Taranov refused to prompt DHHS to act by
filing an appeal undermines any assertion that the DHHS defendants were
deliberately indifferent. See Baez v. Town of Brookline, 44 F.4th 79, 89 (1st
Cir. 2022) ("one cannot prove a town deliberately indifferent to complaints of
police misconduct by failing to cooperate with investigations and not availing
oneself of meaningful procedures for appealing decisions."). And, even if it
could be inferred that Taranov informally complained to DHHS about
Gateways' decision, the allegations do not establish that Taranov provided

any policymaking officials with information sufficient to put them on notice that Gateways was acting unlawfully. See Connick, 563 U.S. at 59 (finding that § 1983 liability could not attach where the plaintiff "did not prove that [the defendant] was on actual or constructive notice of, and therefore deliberately indifferent to, a need" to act). To the contrary, the email from Hunt referenced in the complaint indicates that DHHS was not provided with Gateways' allegedly unlawful plan. Doc. 16-3 at 1. Without such information, it cannot be said that the DHHS defendants made a "deliberate choice" not to act. See Pembaur v. City of Cincinnati, 475 U.S. 469, 482 (1986). Accordingly, Taranov's § 1983 claims against the DHHS defendants must be dismissed.

  2.  Disability Discrimination Claims

Taranov next asserts that the DHHS defendants are liable under Title II of the ADA and § 504 of the Rehabilitation Act because the termination of her adult foster care services subjected her to a serious risk of unjustified institutionalization. The DHHS defendants assert that these claims must be dismissed because Taranov has failed to allege that their actions caused her harm. I agree.

Both Title II of the ADA and § 504 of the Rehabilitation Act prohibit discrimination on the basis of disability, including the unjustified

institutionalization of disabled individuals.[8] See 42 U.S.C. § 12132; 29 U.S.C. § 794; see also Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597 (1999). In order to state a claim, a plaintiff must show that she was "excluded from participation in or . . . denied the benefits of the services, programs, or activities of a public entity," or otherwise "subjected to discrimination by any such entity." 42 U.S.C. § 12132; see also 29 U.S.C. § 794. Accordingly, plaintiffs are required to demonstrate that some act or omission by the public entity caused her harm. See Bacon v. City of Richmond, 475 F.3d 633, 638 (4th Cir. 2007).

Like her § 1983 claims, Taranov's primary theory seems to be that the DHHS defendants are vicariously liable for Gateways' decision to terminate services. Neither the Supreme Court nor the First Circuit has determined whether vicarious liability is available under the ADA. See City & Cnty. of S.F. v. Sheehan, 575 U.S. 600, 610 (2015) (declining to consider whether Title II permits vicarious liability); J.S.H. v. Newton, No. 4:21-40086-TSH, 2023

---

[8]   Title II applies to public entities, including state agencies, whereas § 504 applies to programs receiving federal funds. See 42 U.S.C. § 12131; 29 U.S.C. § 794. Nonetheless, "[g]iven the textual similarities between [the two statutes], the same standards govern claims under both, and [courts] rely on cases construing Title II and section 504 interchangeably." Ingram v. Kubik, 30 F.4th 1241, 1256 (11th Cir. 2022) (cleaned up); accord Kiman v. N.H. Dep't of Corrs., 451 F.3d 274, 285 n.10 (1st Cir. 2006). Because the parties do not distinguish between the two claims, I discuss the claims in terms of the ADA for ease of reference.

WL 1451935, at *8 (D. Mass. Feb. 1, 2023) ("the status of vicarious liability in Section 504 cases is unresolved in the First Circuit."). And the courts of appeals are split on the matter. Compare Ingram, 30 F.4th at 1257 and Jones v. City of Detroit, 20 F.4th 1117, 1121 (6th Cir. 2021) (vicarious liability is unavailable under the ADA), with Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 574-575 (5th Cir. 2002); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1141 (9th Cir. 2001) and Rosen v. Montgomery Cnty., 121 F.3d 154, 157 n.3 (4th Cir. 1997) (ADA claims may be premised on vicarious liability).

Regardless, I need not weigh in on the dispute because, even if vicarious liability is available under the ADA, it would not extend to the actions of government contractors. As a general principle of law, "an entity is vicariously liable for the torts of an employee but not for those of an independent contractor." See Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp., 758 F.3d 378, 386 (D.C. Cir. 2014); accord Restatement (Second) of Torts § 409 cmt. b (recognizing "the original common law rule" of "non-liability of an employer for physical harm caused to another by the act or omission of an independent contractor"). Neither the statutory text nor the case law provides a basis for diverging from this general principle. Indeed,

the parties have not cited, and I have not identified, any cases holding an entity vicariously liable under the ADA for the acts of its contractors.[9]

Thus, if Taranov's claims are to proceed, she must advance a theory of direct liability. Yet, as I have explained, Taranov does not allege that the DHHS defendants were involved in or otherwise caused the decision to terminate her adult foster care services.

Construing Taranov's complaint generously, she could be asserting that the DHHS defendants are liable for failing to ensure that Gateways complied with Title II. This is, as both the courts and the Department of Justice have recognized, a viable theory of liability. Title II's regulations state that the ADA prohibits discrimination both "directly [and] through contractual, licensing, or other arrangements[.]" 28 C.F.R. § 35.130(b)(1). According to the Department of Justice, this means that public entities have "an obligation to ensure that their contractors do not discriminate against people with

---

[9]     In her objection, Taranov cites to several cases that she claims hold "that a state's Single Medicaid Agency can be held liable for the actions of local Medicaid agencies[.]" Doc. 79 at 12-13. The cases cited, however, do no such thing. Most of the cases appear to be nonexistent. The reporter citations provided for <u>Coles v. Granholm</u>, <u>Blake v. Hammon</u>, and <u>Rodgers v. Ritter</u> are for different, and irrelevant, cases, and I have been unable to locate the cases referenced. The remaining cases are entirely inapposite. See <u>Townsend v. Vallas, 256 F.3d 661, 663 (7th Cir. 2001)</u> (affirming dismissal of a teacher's due process claim challenging his employer's disciplinary actions); <u>Doe v. Chiles, 136 F.3d 709, 712 (11th Cir. 1998)</u> (holding that portions of the Medicaid Act may be enforced under § 1983 and that the Eleventh Amendment did not bar the plaintiff's suit).

disabilities." U.S. Dep't of Justice, <u>ADA Update: A Primer for State and Local</u> <u>Governments</u> (last updated Feb. 28, 2020),

https://www.ada.gov/resources/title-ii-primer; <u>see also</u> Hernandez v. N.Y. State Bd. of Elections, 479 F. Supp.3d 1, 12 (S.D.N.Y. 2020) (citing to ADA Primer). "For example," the Department of Justice explains, "a State is obligated by title II to ensure that the services, programs, and activities of a State park inn operated under contract by a private entity are in compliance with title II's requirements." 28 C.F.R. Pt. 35, App. B. Similarly, if a state agency contracts with a private corporation to operate group homes, it "must ensure that [those] contracts are carried out in accordance with title II[.]" U.S. Dep't of Justice, <u>Title II Technical Assistance Manual</u> at II-1.3000 (1994), https://archive.ada.gov/taman2.html; <u>see also</u> Noel v. N.Y.C. Taxi & Limousine Comm'n, 687 F.3d 63, 69 (2d Cir. 2012) ("the Technical Assistance Manual of the Department of Justice . . . is persuasive authority as to the ADA's meaning, unless it is plainly erroneous or inconsistent with the ADA's regulations.").

Citing to Title II's regulations and administrative guidance, a number of courts have found that an entity violates the ADA when it fails to ensure that its contractors comply with the requirements of Title II. <u>See</u> Henrietta D. v. Bloomberg, 331 F.3d 261, 287 (2d Cir. 2003); Castle v. Eurofresh, Inc., 731 F.3d 901, 910 (9th Cir. 2013); <u>see also</u> Hunter v. District of Columbia, 64

F. Supp.3d 158, 169 (D.D.C. 2014) (collecting case and noting that "[a]

number of courts have confirmed that public entities have an obligation to

ensure that their private contractors comply with Title II of the ADA"). For

example, courts have found liability where an entity was deliberately

indifferent to violations by its agents, see, e.g., Montgomery v. District of

Columbia, No. 18-1928 (JDB), 2022 WL 1618741, at *17 (D.D.C. May 23,

2022); Hunter, 64 F. Supp.3d at 169-170; or otherwise failed provide

adequate supervision, see, e.g., Henrietta D., 331 F.3d at 287; Deck v. City of

Toledo, 56 F. Supp.2d 886, 894-895 (N.D. Ohio 1999).

Importantly, however, those cases premise liability on the public

entity's own actions or inactions. Neither the case law nor the administrative

guidance indicates that a public entity is strictly liable anytime one of its

contractors violates the ADA. To the contrary, courts have consistently found

that liability may not attach absent allegations that the entity's own conduct

violated the ADA.[10] See, e.g., Bacon, 475 F.3d at 639-640 ("[Title II] cannot be

---

[10]     Although not cited by the parties, the only case I have identified
arguably to the contrary is Kerr v. Heather Gardens Ass'n, No. 09-cv-00409-
MSK-MJW, 2010 WL 3791484 (D. Colo. Sept. 22, 2010). In that case, the
District of Colorado held that a plaintiff asserted a plausible ADA claim
against a municipal district based on allegations that one of the district's
contractors refused to provide the plaintiff with a reasonable accommodation.
Id. at *11. The court based its holding on its conclusion that "a public entity,
who contracts with another entity to perform its duties, remains liable to
ensure that the other entity performs those duties in compliance with Title
II." Id. The court did not explain, however, how allegations that a contractor

read to impose strict liability on public entities that neither caused plaintiffs to be excluded nor discriminated against them."); Montgomery, 2022 WL 1618741, at *16 n.26 (concluding that a public entity cannot "be held liable for violations committed by agents in the absence of knowledge or deliberate indifference on the part of the [entity]"); Grant-Davis v. Bd. of Tr. of Charleston Cnty. Pub. Library, No. 2:15-cv-2676-PMD-MGB, 2017 WL 9360875, at *11 (D.S.C. May 24, 2017) (finding that plaintiffs' claims failed where they did not allege "that the [defendant] played any role whatsoever" in the allegedly discriminatory decision).

Here, Taranov does not specify how, if at all, the DHHS defendants failed to ensure that Gateways complied with Title II. The complaint does not explain DHHS's system of supervision, let alone allege that the supervision provided was inadequate. And, as I explained, the complaint does not plausibly allege that DHHS was deliberately indifferent to Gateways' violations given that the offending service determination was never presented to DHHS. See Doc. 16-3 at 1; see also Haberle v. Troxell, 885 F.3d

---

violated the ADA, standing alone, plausibly establish that the public entity violated its duty to "ensure . . . compliance with Title II." Id. In contrast to its more limited rule statement, the court appears to hold the district strictly liable for the malfeasance of its contractors without explaining how such a result flows from the statute, regulations, or case law. Given the significant chasm between the court's reasoning and its ultimate conclusion, I find the opinion unpersuasive.

170, 181 (3d Cir. 2018) (quoting S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261 (3d Cir. 2013)) (deliberate indifference under Title II requires that the defendant had "knowledge that a federally protected right is substantially likely to be violated").

At bottom, Taranov faults DHHS for its failure to take preemptive action to overturn Gateways' termination decision. But Taranov admittedly declined to participate in the very process that would spur such action. It bears repeating that DHHS has a system for administrative appeals that allows it to take corrective action before one of its contractors unlawfully discontinues benefits—a system that Taranov was well aware of, but voluntarily elected to forego. See N.H. Code Admin. R. He-M 522.18; see also Taranov v. Area Agency of Greater Nashua, 2023 DNH 010, 2023 WL 1438730, at *2-3 (D.N.H. Feb. 1, 2023). Nothing in the ADA allows Taranov to hold DHHS liable for its failure to intervene in the actions of its contractors when she denied it the means to do so.

To be clear, I remain convinced that public entities cannot "insulate themselves from ADA liability by contracting out to private entities their obligation to provide services in compliance with the ADA[.]" Price v. Shibinette, 2021 DNH 179, 2021 WL 5397864, at *10 (D.N.H. Nov. 18, 2021). But the fact remains that ADA liability must be premised on allegations that "the defendants' own actions or omissions are responsible for" the plaintiff's

32

harm. Compare id. at *9 (concluding that plaintiffs stated a claim under Title II where the complaint sought to hold the defendants liable "for a predicament of [their] own making" rather than "for the failures of their contractors"). Because Taranov has not identified any conduct by the DHHS defendants that allegedly violated the ADA or the Rehabilitation Act, her disability discrimination claims must be dismissed.

   3.   Breach of Contract

Taranov's final claim against the DHHS defendants is that they breached "contracts between the NH DHHS and the US CMS" as well as contracts "between the NH DHHS and the NH BDS[.]" Doc. 16 at 63. Taranov asserts that she is a third-party beneficiary to the contracts and therefore may sue for their breach. The DHHS defendants move to dismiss the claim, arguing that the relevant agreements are not contracts and that, regardless, Taranov is not a third-party beneficiary.

Taranov's claim arising out of the alleged contract with "NH BDS" fails for the simple reason that she does not identify the relevant document, let alone describe its terms or how those terms were breached. Without such allegations, Taranov cannot plausibly allege a breach of contract. See Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007) ("Plaintiffs . . . must do more than allege, in a conclusory fashion, that the defendant breached the contract, by describing, with 'substantial certainty,'

the specific contractual promise the defendant failed to keep.") (quoting Buck

v. Am. Airlines, Inc., 476 F.3d 29, 38 (1st Cir. 2007)).

Taranov's "US CMS" contract claim, on the other hand, appears to be

premised on New Hampshire's approved waiver application for its ABD

program. In order to maintain its waiver under § 1915(c), New Hampshire

must periodically submit a waiver application to CMS. See 42 C.F.R.

§ 441.304. As a part of this application, federal regulations require that the

state provide certain "assurances" as well as affirm its compliance with

various "additional requirements." See New Hampshire Application for

1915(c) HCBS Waiver at 8-12 (Nov. 1, 2021),

https://www.dhhs.nh.gov/sites/g/files/ehbemt476/files/documents/2021-

11/dltss-abdwaiver-renewal.pdf (hereinafter "Waiver Application") (citing to

the relevant regulations); see also 42 C.F.R. § 441.304.[11] These include,

among other things, confirmation that New Hampshire implements

"necessary safeguards . . . to protect the health and welfare" of waiver

recipients and allows recipients to "select any willing and qualified provider

to furnish waiver services[.]" Waiver Application at 8-9. New Hampshire's

---

[11]    I take judicial notice of the approved waiver application because it is a
matter of public record on file with DHHS that was incorporated into
Taranov's complaint by reference. See Disabled Rights Action Comm. v. Las
Vegas Events, Inc., 375 F.3d 861, 866 n.1 (9th Cir. 2004) (noting that courts
"may take judicial notice of the records of state agencies").

currently operative waiver application was signed by Hunt, who affirmed that the state "will continuously operate the waiver in accordance with the assurances . . . and the additional requirements specified" in the application. Id. at 14.

Construing Taranov's complaint generously, she seems to allege that DHHS breached this provision of the waiver application by failing to operate its ABD Waiver program in accordance with the assurances provided in the application. Because CMS, a federal agency, is a party to this alleged contract, I analyze Taranov's claim under federal common law. See Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411 (1947); see also Excel Willowbrook, LLC v. JP Morgan Chase Bank NA, 758 F.3d 592, 597 n.6 (5th Cir. 2014) ("It is well-established that government contracts are governed by federal common law.").

As an initial matter, it is far from clear that New Hampshire's waiver application is a contract. To be sure, the Supreme Court has frequently likened the relationship that arises when a state opts into a grant program to a contractual one insofar as the state receives federal funds in exchange for its compliance with various requirements. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981). Nonetheless, the Court's language has consistently stayed within the realm of metaphor and includes qualifiers that seemingly belie any inference that the acceptance of federal funds

creates an independently enforceable contract. See, e.g., Cummings v. Premier Rehab Keller, PLLC, 596 U.S. 212, 219 (2022) (quoting Barnes v. Gorman, 536 U.S. 181, 186 (2002)) (recognizing the Court's use of a "contract-law analogy"); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998) ("conditioning an offer of federal funding on a promise by the recipient . . . amounts essentially to a contract between the Government and the recipient of funds[.]"); Pennhurst, 451 U.S. at 17 ("legislation enacted pursuant to the spending power is much in the nature of a contract[.]").

In fact, in Bennett v. Kentucky Department of Education, 470 U.S. 656 (1985), the Supreme Court held that grant applications are not subject to normal contract rules. In that case, the United States sought to recover funds issued to Kentucky pursuant to Title I, a Spending Clause enactment that provides states with federal funding for education. Id. at 658. Kentucky received the funds after submitting an application that included various "assurance[s]" required by Title I's implementing regulations. Id. at 660. The federal government's ability to recover the allegedly misused funds turned on whether Kentucky violated those assurances.[12] Id. at 666. In advocating for a narrower interpretation of the assurances, Kentucky argued that, "because the grant program was in the nature of a contract, any ambiguities with

---

[12]    Notably, the United States' ability to recover the funds was based in statute, not contract. See Bell v. New Jersey, 461 U.S. 773, 782 (1983).

respect to the obligations of the State must be resolved against the party who drafted the agreement, i.e., the Federal Government." Id.

The Court rejected Kentucky's argument, noting that, although the "grant agreements had a contractual aspect," they could not "be viewed in the same manner as a bilateral contract governing a discrete transaction." Id. at 669. As the Court observed, grant applications differ from "normal contractual undertakings" insofar as "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," rather than bilateral negotiations. Id.

While Bennett did not address the precise question presented here, its reasoning is instructive. Like Kentucky, New Hampshire provided various "assurances" in exchange for federal benefits. But this does not change the fact that statutory and regulatory law, rather than contract law, governs the ensuing relationship. Perhaps for this reason, the parties have not cited, and I have not identified, any cases finding that a Medicaid waiver application could support a breach of contract claim.

But even if the waiver application is a contract, Taranov cannot sue for its breach. Much like New Hampshire, federal common law requires that a third party seeking to recover for breach of contract establish that she was an intended, rather than incidental, beneficiary of the contract. See Caltex

Plastics, Inc. v. Lockheed Martin Corp., 824 F.3d 1156, 1160 (9th Cir. 2016).

"This is a comparatively difficult task: a party that benefits from a government contract is presumed to be an incidental beneficiary, and that presumption may not be overcome without showing a clear intent to the contrary." Id. (cleaned up); accord Feingold v. John Hancock Life Ins. Co., 753 F.3d 55, 61 (1st Cir. 2014). A party cannot satisfy this burden by merely showing that "the contract operates to the third parties' benefit and was entered into with them in mind[.]" Caltex Plastics, Inc., 824 F.3d at 1160 (cleaned up). Rather, the party must demonstrate that "the contract terms clearly evidence an intent to permit enforcement by the third party in question." Hillside Metro Associates, LLC v. JPMorgan Chase Bank, NA, 747 F.3d 44, 49 (2d Cir. 2014) (cleaned up). Under § 313 of the Restatement (Second) of Contracts, this requires a showing that either:

> (a) the terms of the promise provide for [third party] liability; or
> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

See also Bd. of Comm'rs of. Se. La. Flood Prot. Auth. v. Tenn. Gas Pipeline, 88 F. Supp.3d 615, 646 & n.261 (E.D. La. 2015) (collecting cases and noting that "[f]ederal courts apply the Restatement (Second) of Contracts to determine whether a third party is an intended beneficiary of a contract").

Taranov has not made any such showing here. The terms of the waiver application are silent as to the enforcement rights of any third parties. Cf. Speleos v. BAC Home Loans Servicing, L.P., 755 F. Supp.2d 304, 310 (D. Mass. 2010) (finding that, "[w]ithout any specific statement" in the relevant contracts that third parties "may enforce [the] agreement through breach of contract actions[,] . . . plaintiffs have not stated a claim for breach of a third-party contract"). And Taranov has not asserted, let alone demonstrated, that the United States—the "promisee," for present purposes—would be liable to her or any other member of the public for her damages. Cf. Amato v. UPMC, 371 F. Supp.2d 752, 756 (W.D. Pa. 2005) (concluding that plaintiffs were not third-party beneficiaries to a government contract where they did not allege "that the United States—as promisee to [the] contract—is subject to liability to them for damages caused by [the promisor's] actions"). Because Taranov has neither shown that the wavier application constitutes a contract nor that she would be a third-party beneficiary to any such contract, her breach of contract claims must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, I conclude that Taranov has failed to state a claim upon which relief can be granted. Accordingly, I grant the defendants' motions to dismiss (Doc. 68, Doc. 71). The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

October 16, 2023

cc:      Counsel of record